Davies, J.
It is to be assumed, as clearly established, that the respondent is the son of Valentin -Ferrié and Madame De Lux; and the only question raised upon the argument for our decision is, whether he is the legitimate son of his parents, or an illegitimate. This question arises on the respondent’s application to the Surrogate of New York, where the deceased resided at the time of her death (she dying intestate), for letters of administration upon her estate. The Revised Statutes of this State provide that administration in case of intestacy shall be granted to the relatives of the deceased who would be entitled to succeed to the personal estate, in the following order: ■ First, to the widow; second, to the children; third, to the father; fourth, to the brothers; fifth, to the sisters; sixth, to the grandchildren; seventh, to any other of the next of kin who would be entitled to share in the distribution of the estate. (2 R. S., p. 74, § 27.) Upon the conceded facts, the respondent would be entitled to such letters. He is the child, and the only child, of the deceased, acknowledged by her to be such, and to be her sole and only heir. He could not be such heir, bv the laws of this Statq as the s^'fi'e’xjstfiFnt-the' time of fheoeath of the deceased, lfihewas nothenleaitimate, oEiíd^B^BraBrasserfioYóñ^her partis.a distinct and unequivocal declaration of his legitimacy, and, being made ante litem motam, is properly to be regarded as evidence upon that point. I attach no little importance to the fact that it was made in articulo mortis, when all motives for concealment or prevarication must have ceased to exist or operate upon her, and when, it may be well assumed, she should desire the exact truth to be known, that tardy justice might be done to the object of her affections, her caprices, and persecutions. For fifty-four years *95 she had exhibited for him, at times, all of a mother’s tenderness and love; again of cold neglect, then of returning affection, followed by personal abuse, insolence and persecution. A wounded and disturbed conscience might well have impelled her, on her dying bed, to make all the reparation then in her power, by declaring his true status and his right to succeed to the inheritance of the property which, by miserly accumulations, she had acquired. It is, I think, manifest'that, during her long life of toil and penury and self-denial, she never lost sight of the fact that all she saved and all she could make was ultimately to go to make a gentleman of the child of her youth and early affections.
It being shown and conceded that the respondent was the' son of the decedent, he was entitled to the letters. The presumption of the law was that he was her legitimate son; and those who assume the fact of illegitimacy have cast upon them the onus of establishing it. The primary tribunal in the present case, and the appellate court, have both arrived at the conclusion that the appellant has failed to make out the status of the respondent’s illegitimacy. It is for this court to say if such decision is erroneous.
It is urged, in the first place, that, as the intercourse between the parents of the respondent was illicit in its commencement, the presumption of .the law is that it so continued, and that the intercourse being illicit at the time of the concubitus, such condition must be assumed to have continued to the time of his birth. This, undoubtedly, is the well-settled rule. (Cunningham v. Cunningham, 2 Dow’s P. C., 482; Clayton v. Waddell, 4 Comst., 236.) If it was subsequently changed, at what time did it become lawful? The circumstances which have impressed my mind with the conviction that it was changed, are the following: It must be assumed that both parents were aware of the necessity of this change. The father, it is clear, not only intended marriage, but was most anxious and determined to consummate it. The only difficulty arose from the opposition of his father; and it is'quite clear to my mind that he determined to brave that, though it deprived him of a home, *96 the association and friendship of his family, and the disruption of his business relations. His flight from his father’s house can only be accounted for on the assumption of his intention to marry Jeanne. ¡Neither his father nor any other member of his family objected to his connection with the respondent’s mother, as his mistress; but, to secure his marriage with her, flight from his home and estrangement from them were the inevitable necessity and result. These he met for this purpose; and when we see that such estrangement continued, and friendly relations with them were never resumed, can we doubt that he consummated his intention, and that the ¡knowledge of that fací was the cause of the original and continued estrangement and separation from his family ? In addition to this, and as evidence of the change of their condition, we have the public proclamation of the intended celebration of marriage, on the 20th of May, before the president of the commune of St. Girons, and the public record made thereof. It is true, no acts of marriage has been found on record; and it will be seen hereafter how much importance is to be attached to that circumstance. Then we have the removal of father and mother together to the house of Benóz, where they éohabited together, and lived as husband and wife. The only two witnesses who knew them at that time, who have been examined, were Daffis, the friend of Valentin, and De Galai, a female friend of Madame Anóre and Jeanne. Daffis says they lived together one or two years, and she had a child by him, born and baptized at St. Girons. He speaks of the opposition of the father of Valentin to the marriage, and that he charged his son with stealing leather from him to procure money for Jeanne. The child took the name of Ferrié there. He never knew whether Valentin was married to Jeanne or not. He did not know whether she was his wife or not. He never heard anything said of a proposed marriage between Jeanne and Valentin. Miss De Galai, who was two years the senior of Jeanne, seems to have known her well at St. Girons. She did not know that she was married; but she lived with Ferrié a long time at M. Benóz’; that they lived together there; that they cohabited *97 there. She had a child there, and which was baptized. They lived together some time before and after the aecouchment; that they lived together as if they were husband and wife. She did not know of any act of marriage existing between them; that they were both together when the child was sent to nurse. She understood they wished to be married, but did not know whether they were or not. Valentin was present at the aecouchment. She had heard Ferrié speak of Jeanne by the name of Ferrié. She recollected well that they both went to see the child at nurse; and they went to Bordeaux together. The people of the quarter where she lived called her Madame Ferrié. She had heard them call her so many times. She had heard Ferrié speak of her by the name of Ferrié. She had heard Madame Anére call Jeanne Icard Ferrié many times; and M. Anére called her by that name. I dismiss from consideration the testimony of the other witnesses at St. Girons, as most of them have been born since Madame De Lux left there, and they speak of reports and conversations which evidently were of recent origin. There is one exception to this remark, and that is Catherine Ferrié, widow of DAplus, the sister of Valentin. She was only five years old at the birth of the respondent, and at the time Valentin and Jeanne left St. Girons, she did not know they were married. She knew that her brother quitted her father’s house, and occupied a chamber with a woman who was a servant next door; that her father opposed the marriage, and the family'recognized Jeanne as the “ bonne amie,” or mistress, of Valentin, and not his wife, as they were opposed to that; that they left St. Girons together. She manifestly knew nothing of the status of the respondent, as she stated he died right away after his birth. She says: “ After Valentin left his father’s house he never returned to it again to live. His father refused to hold any relation with him. Valentin wished to marry Jeanne. His father did not wish him to marry Jeanne, and his father would not hear it spoken of, and forbid the children to go and see him after he left the house. Valentin wished to marry her before he left the house. I was too young for him to talk to *98 me about it, but it was well known in the family and discussed. Valentin worked at his occupation with his father, but after his flight from the house he worked for him no longer. He worked • for some of his brothers who worked at the same trade, and who had tanneries. I know of no other objection that his father had to the marriage than that she was a servant. On that account the family were opposed to it.” The respondent was examined before the Surrogate, and testified that his mother told him that she and his father took him to the nurse and left him there; that she went almost every week to see Mm, but he only went two or three times. “ She did not say how she was married. I could never ask her any questions on that subject. When I was baptized, my godfather was my' father’s brother; his name was Ferrié. Thinks his godmother was some relation to his father’s family.” " From these facts, what are the probabilities of the marriage of Valentin and Jeanne ? I must say they are persuasive in impressing my mind with the conviction that they were actually married, and I think at or about the time of the flight of Valentin from his father’s house, and wMch must have been before he went to the' house of Benóz, and before the birth of the respondent. I will here take the occasion to say, that the testimony has satisfied me that, with' the exception of the illicit intercourse' between the parties, their characters were good, and no cause of reproach, or suspicion derogatory to either, existed or- had any circulation, until after they left Si, Girons. I think the reports of the Easons of Jeanne, and rumors prejudicial to her and of the illegitimacy of the respondent, testified to by the various witnesses,' may all be traced to the known and avowed fact of her living with respondent’s father and having had a child by him, and the notorious hostility of Valentin’s father and family to his marriage, and the assumption that such hostility had been effectual to prevent it. His family regarded such a marriage as disgraceful to them; they had, therefore, every motive to deny it publicly. They never admitted, its existence, preferring to disgrace their relative by causing it to be believed that Jeanne was his mistress, apd that his issue by *99 her was a bastard. Their passions were excited by his flight from his father’s house, and his avowed determination to forsake all others and cleave only unto her. They have always persisted in this course of action; and this satisfactorily accounts to my mind for the interpolation, upon the record of the intention to celebrate the act of marriage, of the word “ neant," or null. The law authorized no such proceeding, and it is, therefore, to be presumed it was not done by any public officer in discharge of his prescribed duties. If, as was Contended on the argument, Valentin was a minor at the time, and this entry is to be regarded as evidence that his father refused his consent, and therefore the intended marriage was null, it is a conclusive answer to say that the law, in such a contingency, prescribed a different form for indicating these facts. The marriage of a minor could be opposed by the father; and if such opposition was made, the law prescribes the mode and manner of determining its reasonableness, in the nature of a judicial proceeding; and a copy of the judgment thereon is to be delivered to the public officer having charge of thé record of publication, “who shall make mention of them in the margin of the record of' opposition on the record of publication.” It is clear that the entry of the word “ neant" in the margin of the record of publication, in the present instance, was not made in conformity with this provision of law, and did not, therefore, proceed from any act of opposition made in compliance with its terms. It is, therefore, null and of no legal significance. It does not appear when, or by whom, it was made, whether before or after the death of Valentin Ferrié. I think it more probable that it was written there after the death of Valentin, and by some of his relatives, to efface the only record evidence of his marriage with Jeanne. The determination on their part never to recognize any such marriage stands out clear and undisputed; and it would be natural for them, after the death of Valentin and the departure of Jeanne to America, and the supposed death of their issue, to do what they could to efface the evidence of what they regarded as a stain upon their family. They could not destroy the record; they could not obliterate *100 what was written; they could not get an act of opposition, for the reasons which will be presently stated; and, therefore, all they could do was to assume that the acte of marriage had never been celebrated, and either by their own hand write in the margin of the record the word “ neant,” or prevail on the officer having it in charge to do so, on the representation that no act under it was ever performed. In either aspect it had no legal warrant, and is not entitled to any weight as evidence that a marriage between the parties never took place. On the reappearance of Madame De Lux at St. Girons, with her son, this persistent declaration of the family, that no marriage had taken place between "Valentin and Jeanne, and this aspect of the record, might well serve to convey the impression that such issue "was illegitimate. To circulate such a report, and cause it to be generally believed, was in harmony with the avowed purpose of Valentin’s family, that he should not marry Jeanne, and, after he had left his father’s house for that purpose and lived with her as her husband, to have it understood and believed that such connection was meretricious.
This seems an appropriate place to consider whether any opposition, under the French law, to the marriage, could legally have been made. The act of 1792, which was in force at the time, prohibited the marriage of minors, that is, persons under the age of twenty-one years, without the consent of their father or mother; that the consent of the father was sufficient, and only those persons whose consent is required for the marriage of minors could offer or make an act of opposition. I think I have satisfactorily shown that no opposition, in the meaning of these provisions, was made to this marriage by the father, and that the entry of the word “ neant ” has no connection with this act of opposition, as defined and regulated by the French law. But I think a more satisfactory and conclusive answer can be given to this view of the case. The evidence has satisfied me that no act of opposition could be made, for the reason that both of the parties at the time had attained their majority. It is true that the declaration of intention states the ages of the parties, and states that Valentin is aged nineteen years and *101 Jeanne twenty-one years. It is to be observed that the law does not require the ages of the parties to be stated in this acte of publication. It is, therefore, surplusage, and not entitled to much consideration. It is clear that Jeanne’s age is not truly stated, as she was then twenty-two years old, and on the 24th of November following would have been twenty-three. The statement of Valentin’s age is only presumptive evidence, and though, if he were a party here, on the assumption that he caused the act of publication to be made, it would be regarded as truly stated, yet clearly he would have been at liberty to have shown that his age had been erroneously stated. I see no ground upon which he would be estopped from showing the truth in this respect. A fortiori, if he would not, the respondent is not precluded from establishing what his age actually and truly was at that time. I think the evidence satisfactorily shows that Valentin Ferrié, at the time of the act of publication, was of full age, and could lawfully enter into the contract of marriage, without reference to the consent or opposition of his parents. Two only of the witnesses who have been examined speak as to his age, and both, I think, establish that he was then of full age. His sister, the widow D’Aplus, who must.be presumed to know his age the most accurately, says that, at the time of her examination, in September, 1855, she was sixty years of age. She must, therefore, have been born in the year 1795. She also states that Valentin was twenty years older than she was. If this be true, and I can see no reason to doubt it, he was consequently bom in the year 1775, and was twenty-five years of age in 1800— a reasonable and proper age to contract matrimony with a girl about two years his junior. The Chevalier Daffis, the only other witness who speaks in reference to his age, does not speak with the same exactitude and certainty, and cannot be presumed to have that accurate knowledge on this point which his sister possessed. He said he was seventy years of age in September, 1855. I understand by this expression that he was past seventy and not yet seventy-one. He knew Valentin Ferrié well. He was six years older than himself. It follows, *102 therefore, from this statement, that Valentin must have been born in 1778 or 1779. I place more reliance on the testimony of his sister; and I only refer to that of Daffis as confirmatory of her evidence. Valentin was, I think, in fact, nearly ten years older than the Chevalier; and the apparent .discrepancy between his statement and the positive testimony of the sister does not, in my judgment, weaken at all that of the latter. I assume, therefore, that it is established that Valentin was of lawful age to contract matrimony in May, 1800, and under no disability whatever by reason of non-age.
In support of the view that the marriage relation existed between him and Jeanne, in addition to the facts already refer red to, may be cited that, in his presence, without dissent on his part, she was called by his name and known by it; and a strong circumstance in corroboration of this position, to my mind, is, that the child born to him by her took, with his privity and by his procurement, his own name, by which he has always been known, through the whole of his life. The ade of baptism, procured by him on the day of the birth of his son, when, we know, the mother must have been in the house of Benóz, speaks a most significant language. He takes his offspring, immedi ately upon its birth, accompanied by two of his relatives, who assume the responsible offices of godfather and godmother, to the curé, and has him baptized according to the rites of the church and a public record made thereof, and that he was the son of Valentin Ferrié and Jeanne Icard. If it was the child of shame and disgrace, we can hardly find a motive for thus hastily making an enduring record of the infamy of the parents and a perpetual memorial of their son’s dishonor. Much stress is laid on the circumstance that, in this record, Jeanne is described as Icard, and not Ferrié, as it is urged she would have been if, in fact, she was his wife. It is quite apparent that it was the custom of the French people-in that vicinity, in public acts of this character, in speaking of a female, although a married woman, to designate her by her maiden name.- In the ade of the publication of the marriage, Valentin is described as the son of Balthazar Ferrié and of Francés Gazes—Gazes being the *103 maiden name of his wife; and Jeanne is described as the daughter of Jean Icard and Magdalen Riviere.. In each instance the wives of Ferrié and Icard are called by their maiden names. So in the registration of the disposition of the assets of Balthazar Ferrié’s wife, made by their children in 1816, she is called Francoise, or Francés Gaze, their mother; and in the registration of the assets of Balthazar Ferrié, made by his children in 1823, he is spoken of as Balthazar Ferrié their father add father-in-law, widower of Francoise Gaze their mother. So in the .record of baptism of Jeanne, she is described as the daughter of Jean Icard and Magdalen Riviere. So also in the record of the baptism of her brother Alexis, he is described as the son of John Icard and Magdalen Riviere his spouse. In like manner, in the record of the baptism of her sister Jane, she is described as the daughter of John Icard and Magdalen Riviere. And in the record of the marriage of the parents of .Jeanne, her father is described as the son of John Icard and Louise Fischéere, and her mother as the daughter of P. Rivierre and of Catherine Lafitte. I think, therefore, the argument that these parties were not married derives no force from the circumstance that Jeanne is described in the baptismal record by her maiden name, instead of that of -Ferrié. 'We see that the same practice was uniformly adhered to in reference to those about whose marriage no doubt can be raised; and I think, in this connection, it should be observed, that no inference adverse to the conclusion that she had been married to Ferrié is to be drawn from the fact that, in the certificate of marriage with De Lux, she is described by her maiden name of Jeanne Icard.
I arrive at the conclusion, from all these facts, that we can assume that there was a marriage celebrated between Valentin and Jeanne, either per verba de prcesenti, or before some proper officer, in fulfillment of their publicly declared intentions. I give great consideration, and to which I think it is entitled, to the solemn declaration of Madame De Lux on her death-bed, that she had been married in France during the Revolution, Such declaration, coupled with the frequent assertion that the respondent was her sole heir and would take all she left, could *104 only refer to a marriage with the respondent’s father; and I have no doubt that marriage was in her mind at the time she had the conversation with Madame Grieser. The declarations of the parties, if deceased, that they were married, provided they were made ante litem motam, are admissible evidence of the fact declared. Such declarations, made by the parents in life, are admissible as evidence to establish the legitimacy of their issue. (Goodright v. Moss, Cowp., 591, and cases there cited. See also the answer of the judges to the third question put to them in the Berkley Peerage Case, 4 Camp., 418.) The mere cohabitation of' two persons of different sexes, or their behavior in other respects as husband and wife, always affords an inference of greater or less strength that a marriage has been solemnized between them. Their conduct being susceptible of two opposite explanations, we are bound to assume it to be moral rather than immoral; and credit is to be given to their own assertions, whether express or implied, of a fact peculiarly within their own knowledge. (Hubback on Succ., p. 248, citing Rex v. Stockland, Burr. S. C., 508; 1 W. Bl., 367; Revel v. Fox, 2 Ves., Sr., 270; Doe, ex dem. Fleming, v. Fleming, 4 Bing., 266; Hervey v. Hervey, 2 W. Bl., 877.) “ Cohabitation,” says Lord Stair (Inst., lib. 1, tit. 4), “ and the behavior of man and wife for a considerable time, presumeth marriage, though there be neither contract, promise, nor sponsalia preceding, nor evidence of copulation by children.” How much more reasonable the presumption in the present case, where clearly there was a contract and promise, and there is evidence of copulation by the birth of a child. In Devereux v. Much Dew Church (1 W. Bl, 367), being a question upon the validity of a marriage which was alleged to have taken place after the marriage act of 26 Geo. II, Lord Mansfield said: “In a suit in the Ecclesiastical Court for jactitation of marriage, perhaps it may.be necessary to prove that all the solemnities of the marriage act have been practically and regularly complied with. But God forbid, that, in other cases (the legitimacy of children and the like), the usual presumptive proofs of marriage should be taken away by this statute.”
*105 Hervey v. Hervey (2 W. Bl., 877), was a suit for jactitation of marriage, and it was insisted that direct proof of an actual marriage was essential; and the Chancellor of London and the Dean of the Arches held that the canons did not allow a marriage to be proved, inter vivos, by mere circumstantial evidence; but on appeal to the Delegates it was held that the evidence showed a most solemn and deliberate acknowledgment and avowal on the part of the plaintiff, the husband, of the truth of the marriage that could be devised, and that he should not now be admitted to controvert or impeach it. And they therefore -unanimously pronounced for establishing the marriage. A prominent circumstance relied on as establishing the fact of marriage was that a child, born a few weeks after they proclaimed and acknowledged they were married, was christened, and a brother of the husband and an uncle of the wife were two of the sponsors, and the child was registered as the son of Thomas and Ann Hervey. In the present case the baptismal record was made at the instance of the respondent’s father, and he is therein truly described as the son of Valentin Ferrié and Jean Icard. Does this mean the bastard son of those parents, or their legitimate offspring? The law presumes the latter, and such presumption must control until overthrown.
Wilkinson v. Adam, (1 Ves. & Beame, 422) strongly corroborates this view. At page 462, the Lord Chancellor Eldon says, the rule cannot be stated too broadly, that the description, “ child, son, issue,” every word of that species, must be taken, prima facie, to mean legitimate child, son, or issue; and at page 466 he also says that all the cases go to this, that the description of son, child, &c., means, prima facie, legitimate son, &c. When, therefore, in the solemn act of baptism, the respondent is described as the son of Valentin Ferrié and Jeanne Icard, we are justified in holding that his legitimacy is established, prima facie.
But it is strenuously insisted that the non-production of the act of marriage between the respondent’s parents, or other direct or positive proof of a solemnization of marriage between them, are sufficient to overthrow the presumption which the *106 law' makes of the prima facie legitimacy of the. respondent. The principles of the common law regulating marriage in this State are few and simple. To render it legal and valid, no ceremony, no solemnization, by minister, priest or magistrate, are required. Consent of the parties is the only requisite, and the marriage contract is complete when there is a full, free and mutual consent by the parties capable of contracting, even when such consent is not followed by cohabitation. (Jackson v. Winne, 7 Wend., 47.)
The case of Fenton v. Reed (4 Johns., 52), is entitled to more than a passing notice. The point in controversy was, whether the plaintiff was the widow of Eeed. In 1785 she was the lawful wife of a man named Guest. In that year Guest left the State for foreign parts, and continued absent until 1792; and it was reported and generally believed that he died in foreign parts. The plaintiff, in 1792, married Eeed. In that year, and after the marriage, Guest returned to this State, and continued to reside here until June, 1800, when he died. He did not object to the connection between the plaintiff and Eeed, said he had no claim upon her, and never interfered to disturb the harmony between them. After the death of Guest the plaintiff continued to cohabit with Eeed until his death in September, 1806,'and sustained a good reputation in society; but no solemnization of marriage was proved to have taken place between the plaintiff and Eeed, subsequent to the death of Guest. The suit was brought to recover money which she would be entitled to if the widow of Eeed; and, to maintain, it, she sought affirmatively to establish her marriage with Eeed. The court declared that the marriage of the plaintiff with Eeed, during the lifetime of her husband Guest, was null and void; that she was the lawful wife of Guest, and continued so until his death in 1800; and the true question was, whether there was evidence sufficient to justify the court in concluding that she was afterwards married to Eeed. And the court also say: “ It is stated that there was not proof of any subsequent marriage in fact, and that no solemnization of marriage was shown to have taken place. But proof of an actual marriage was *107 not necessary. Such strict proof is only required in prosecutions for bigamy, and in actions for criminal conversation. A marriage may be proved in other cases from cohabitation, reputation, acknowledgment of the parties, reception in the family, and other circumstances from which a marriage may be inferred. Ho formal solemnization of marriage was requisite. * * A jury would have been warranted, under the circumstances of this case, to have inferred an actual marriage, and the court below had sufficient ground to draw that conclusion; and, as they have drawn it, we will not disturb it.” If the circumstances in that case authorized the inference of an actual marriage, how much stronger are they in the" case now under consideration. There the intercourse between the parties was originally meretricious, and they confessedly lived in adultery until the death of Guest, in 1800. Ho fact was presented, other than that they continued to live together until Reed’s death, from which the inference of a marriage after Guest’s death could be inferred; and it is to be observed, also, that, in this case, the plaintiff sought affirmatively to establish the fact of her marriage with Reed. Less stringent proof is, however, required in matter of pedigree; and the rule would seem to be well settled, that semper presumitur pro legitimations puerorum. (5 Rep., 98 b; Vowles v. Young, 13 Ves., 145.) The law is unwilling to bastardize children, and throws the proof on the party who alleges illegitimacy; and, in the absence of evidence to the contrary, a child, eo nomine,' is, therefore, a legitimate child. (2 Hagg. C. R., 197; 4 Eng. Eccl. R.; 13 Ves., 145; Wilkinson v. Adam, supra.) And, in Vowles v. Young, the Lord Chancellor Erskine said, in reference to proof of an actual marriage, that the evidence, especially in the case of obscure families, must be very slight. As sustaining the same rule may also be cited Starr v. Peck (1 Hill, 270); and the qualification of that case, as made in Cheney v. Arnold (15 N. Y., 345), does not weaken its authority on the question of the duty of this court to presume matrimony, when the parties have cohabited, and there are circumstances from which a present contract may be inferred.
*108 I have been unable to find any authority in this State, on a question of legitimacy, which requires the heir, and acknowledged and conceded child, to prove an act of marriage as a requisite to maintain his legitimacy. The presumption and the charity of the law are in his favor; and those who wish to bastardize him must make out the fact by clear and irrefragable proof.
A striking and leading case, as to the controlling character of presumptions, is that of Piers v. Piers (2 H. of Lords Cases, S81). Piers had long been living in concubinage with a woman by whom he had several children. In expectation of the birth of another child, and that he might have lawful children to inherit his estates, he and the. mother of his children desired to be married. And a marriage was alleged to have been celebrated between them in form, but no license was shown from the bishop, nor any entry found in the marriage register. After the birth of two more children, and six years subsequently, a marriage was again celebrated between them, according to law and the forms of the established church, and the lady was described in the marriage certificate by her maiden name, and a child, born after the first and before the second marriage, was baptized as the child of the wife by her maiden name. The question arose as to the legitimacy of the two children bom after the alleged celebration of the first marriage and before the second ceremony of marriage. The House of Lords affirmed the legitimacy of the two children born after the first marriage, holding that, so strong was the presumption in favor of marriage, that it was not rebutted by the circumstances appearing in the case. The principle, fully recognized and established in this case, was, that the question of the validity of a marriage cannot be tried like any question of fact which is independent of presumption, for the reason that the law presumes strongly in favor of marriage, particularly after the lapse of a great length of time. And it is to be observed that the length of time and other circumstances existing in the present case greatly increase the embarrassment and difficulty of proving a marriage over those which appeared in that case. *109 Consequently, we are to give greater weight to the presumption in favor of the marriage, and to be satisfied with proof of a less decisive character. The court, in Piers v. Piers, seemed to adopt the doctrine laid down by Lord Lyndhuest, in Morris v. Davies (5 Cla. & Fin., 163), that “ the presumption of law is not lightly to be repelled; it is not to be broken in upon or shaken by a mere balance of probability; the evidence for repelling it must be strong, satisfactory and conclusive.” Lord Oottesthah, in Piers v. Piers, stated the proposition in these words: “A presumption of this sort in favor of a marriage can only be negatived by disproving every reasonable possibility.” “You should negative every reasonable possibility.” Lord Brougham criticised the expression used by Lord Lyhdhurst in Morris v. Davies, that the evidence to repel the presumption must be “conclusive,” and did not concur with him in that respect; but I understand him as going to the full length of affirming the rule as stated by Lord Cottenham.
Applying these principles to the case under consideration, we start with the presumption in favor of the marriage, and which “can only be negatived by disproving every reasonable possibility.” Now, I think the circumstances adduced to overcome this presumption fall far short of accomplishing that object; and those of a contrary character not only more than repel this counter proof, but sustain strongly the presumption that the law makes. (See also the cases of Gaines v. Chew, 2 How. U. S. R., 620; Patterson v. Gaines, 6 id., 550.)
The learned Surrogate has shown, I think, satisfactorily, that the non-production of the acte of marriage, under the circumstances disclosed in this case, does not overcome the presumption of law dr the conclusions of fact derived from the proofs in this case. The authorities cited by him from the French text-writers, and the cases decided in the courts in France, show, I think, conclusively, that if this case was pending in the tribunals of that country, the legitimacy of the respondent would unquestionably be established. As the status of the respondent must, perhaps, be governed by the rules of law applicable to the marriage relation existing there at the time *110 of Ms birth, it is satisfactory to know that the well-established principles prevailing there lead to the same result as those which have been recognized here.
I have arrived' at the conclusion that the presumption of law in favor of the marriage of the respondent’s parents, and his legitimacy, have not been negatived and overthrown by the proof adduced by the contestants; but that such proofs, in connection with this presumption, lead to the conviction in favor of such marriage and his legitimacy.
It follows, that the judgment of the Surrogate and of the Supreme Court should be affirmed.